IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In re:  
MARK LEE COCHRAN,  
   *Debtor*.

Case No.: 18-69-JCO  
Chapter 13

AZALEA CITY  
CREDIT UNION,  
   *Plaintiff*  
v.

MARK LEE COCHRAN,  
*et al.*,  
   *Defendants*.

Adv. Proc. No.: 18-14-JCO

## MEMORANDUM OPINION AND ORDER

This matter came before the Court on August 12, 2019, for a trial on the Amended Complaint filed by the Plaintiff, Azalea City Credit Union (hereinafter "ACCU") and the Third Party Complaint filed by Defendant Debtor Mark Cochran (hereinafter "Debtor" or "Cochran") against Defendant Vernon Chatman (hereinafter "Chatman"). Appearing on behalf of ACCU was attorney Greg McAtee, and on behalf of Debtor was attorney Hendrik Snow. Although properly served, Mr. Chatman did not appear in person or through counsel at trial.

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157, and the order of reference of the District Court dated August 25, 2015. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the Court has authority to enter a final order.

## FACT AND PROCEDURAL HISTORY

On March 9, 2018, ACCU filed its Complaint pursuant to 11 U.S.C. § 523 alleging multiple theories for the nondischargeability of the debt owed to it by Debtor. (Doc. 1). On December 26, 2018, the Debtor filed an Answer denying the allegations alleged therein and filed his own Third Party Complaint against his former business partner, Vernon Chatman, alleging

that Mr. Chatman was the party who perpetuated the fraud against ACCU, and therefore Debtor is entitled to receive a discharge of the debt. (Doc. 38). On January 30, 2019, ACCU amended its Complaint adopting and incorporating by reference the Debtor's Third Party Complaint. (Doc. 48). On April 13, 2019, Chatman was properly served with the Amended Complaint more than thirty days prior to the trial setting. On July 6, 2019, Mr. Chatman was properly served with a subpoena to appear before the Court to testify at trial on August 12, 2019. Mr. Chatman did not appear in person or through counsel at the trial.

Testifying on behalf of Plaintiff ACCU was Stacy Besnall.[1] Ms. Besnall has been a loan officer with ACCU for approximately seven years and is the loan officer who processed the loan in question herein. Debtor Mark Cochran testified in his own defense. The Court found both witnesses to be credible, forthright and honest.

At trial, Cochran testified that previously, he was common law married to Edna Chatman, who is Vernon Chatman's sister. Edna introduced Cochran to Chatman and sometime in 2016, Chatman approached Cochran about becoming a business partner with Chatman in the formation of Next Phase Auto Sales, LLC (hereinafter "Next Phase"). In September of 2016, Cochran and Chatman formed Next Phase Auto Sales, LLC as a used car sales business. Chatman chose the name of the business; Cochran was the named owner of the business, but Chatman had full authorization to make decisions for the business, to manage the business bank accounts, to receive and send mail on behalf of the business, and to conduct the day-to-day operations of the business. The business was funded by floor plan financing through a business bank account held at Commonwealth National Bank. There were only two car salesmen, including Chatman. Of

---

[1] There were multiple spellings and pronunciations of Ms. Besnall's name during trial. The Court acknowledges that Besnall is not the proper spelling of Ms. Besnall's name, but it will be used anyway, as it has already been placed on the record as such. (Docket entry 74).

the two, Chatman made the most sales.

Cochran testified that, at first, Chatman reported the business as doing ok, with car sales happening on a steady basis. Cochran did not initially realize any profits from the business, but he had another full time job at Ingalls Shipbuilding in Pascagoula, Mississippi, and trusted Chatman to run the business efficiently. As the first year progressed, Cochran noticed that car sales were starting to slow down.

Around the time that sales started to slow, in May of 2016, Cochran testified that Chatman asked Cochran to meet him at the ACCU branch in Calvert, Alabama to sign some paperwork regarding a 2014 Mercedes to be sold on the used car lot. Cochran had financed used vehicle purchases in the past for Chatman this way, so he agreed to the same on this occasion. Cochran had never been to the Calvert ACCU branch and asked if the paperwork could be signed at a location closer to Cochran's job in Pascagoula, Mississippi than in Calvert.[2] Chatman refused, and Cochran drove to Calvert to sign the paperwork.

Prior to Cochran going to ACCU in Calvert, Chatman had already initiated the loan with Ms. Besnall and ACCU. In initiating the loan, Chatman never mentioned to Ms. Besnall that he and Cochran were business partners in Next Phase Auto Sales. He presented the loan request as though it was for a customer purchasing a car from the used car lot. Ms. Besnall testified that she had done business this way with Chatman before, so nothing appeared to be out of the ordinary with this transaction at that time. Ms. Besnall testified that on June 1, 2016, she received a Buyer's Order from Chatman from his email account regarding a loan for a used 2014 Mercedes CLS Class sedan. (Plaintiff's Ex. 10). The Buyer's Order provided information on a 2012 Mercedes S Class that was to be traded in at the purchase of the 2014 Mercedes. (*Id.*). The

---

[2] The drive from Pascagoula, Mississippi to Calvert, Alabama is approximately one hour and eighteen minutes.

Buyer's Order was in Mark Cochran's name and Chatman was listed as the salesperson. (*Id.*). The Buyer's Order was for the total balance of $47,294.18. (*Id.*). The gap insurance, GAP Waiver Addendum and CUNA insurance policy were all in Cochran's name. (Plaintiff's Exs. 11,14, 13, respectively). The Electronic Funds Transfer Authorization Agreement was in Cochran's name. (Plaintiff's Ex. 12). Cochran testified that he signed the Transfer Authorization Agreement, but that the remainder of the document was not filled out in his handwriting.

When Cochran arrived at ACCU in Calvert on June 1, 2016, the loan was already initiated in his name, and ACCU had already prequalified Cochran to receive the loan based on Cochran's personal information and pay stubs provided by Chatman to ACCU.[3] All that was left to do was for Cochran to fill out the remaining paperwork and present proper identification and the loan would be approved with the funds to be disbursed to the dealer by direct deposit shortly after the loan was processed. During the transaction, Chatman never mentioned to Ms. Besnall that the loan was not being made for Cochran to purchase a personal vehicle as a Next Phase customer or that Cochran and Chatman were business partners in Next Phase. Chatman also never mentioned to Besnall that he had not even seen the car, and he also failed to discuss that the 2012 Mercedes trade-in vehicle listed on the Buyer's Order did not exist. (Plaintiff's Ex. 10).

Both Cochran and Ms. Besnall testified that they had never met each other or had any contact before the day that Cochran came to ACCU to sign the paperwork. Cochran testified that he filled out the paperwork with the assumption that the loan was to obtain a car, not for his personal use, but to be sold on the used car lot and that the loan balance would be satisfied by the sale proceeds. Cochran was under the impression that ACCU knew of this arrangement as well.

---

[3] Cochran testified that Chatman had access to his personal information from when they formed Next Phase as business partners.

Cochran testified that though he had never seen the vehicle being financed prior to June 1, 2016, he assumed that Chatman would be able to readily obtain it after getting the loan, and that this transaction was in the ordinary course of the business for Next Phase. Once the loan was processed, the funds were transferred by direct deposit into the Next Phase Auto Sales, LLC operating account the following day.

Ms. Besnall testified that prior to this transaction, she had known Chatman for approximately ten years and had done business with him in the past at Shoreline Credit Union before she became employed with ACCU. She further testified that ACCU had previously done business with Chatman, making ten to twenty car loans per month with Chatman. She testified that other loans involving Chatman had gone delinquent in the past, but that is the sometimes the cost of doing business.

In auditing its records, Ms. Besnall testified that by the end of 2017, ACCU was missing the certificate of title for one of its loans made to Chatman. ACCU began to check for certificates of title on other loans associated with Chatman and Next Phase and realized that about twenty to twenty-one titles were missing. When ACCU attempted to verify its possession of the certificate of title on the subject 2014 Mercedes, not only could they not locate the title, they could not locate the vehicle either.

In the meantime, Cochran testified that he never made a payment on the loan to ACCU. He testified that Chatman had access to the business bank account and was in charge of the daily business of Next Phase, so Cochran never made a payment on this loan or any other loan that he personally financed for Next Phase. He stated that occasionally, Chatman would give Cochran a check from the business account for Cochran to deposit into his personal account to make payments on loans, but when the checks started bouncing, Cochran quit receiving them from

Chatman. When Cochran asked Chatman about the bounced checks, Chatman was dismissive and told Cochran that he was handling it. Cochran took Chatman at his word that it was being handled. At some point after these checks bounced, the bank contacted Cochran asking that he remove Chatman from the account. Cochran closed this account and opened a new joint account with Regions Bank in the name of Next Phase, Cochran and Chatman. At this point, Chatman promised Cochran that he would get the business back to the way it was, but Cochran testified this turned out to be an empty promise.

Ms. Besnall testified that ACCU only received three good payments on this loan. (Plaintiff's Ex. 15, p.3, payments dated July 14, 2016, August 16, 2016, September 13, 2016). When the payments quit coming in, ACCU first contacted Cochran about the delinquency; however, Cochran testified that he does not recall receiving any phone calls from ACCU regarding the account. ACCU then contacted Chatman regarding the delinquency, but was unsuccessful in communicating with him, so the account remained delinquent. Shortly thereafter, ACCU quit doing business with Chatman.

ACCU sued Mark Cochran in the Mobile County Circuit Court, and on August 30, 2017, it got a default judgment against Cochran for the vehicle and for its alternate value of $38,250.00, plus attorney fees and costs. (Plaintiff's Ex. 16). On January 7, 2019, ACCU ran a CARFAX Vehicle History Report which resulted in no information on a 2014 Mercedes coming into possession of Next Phase Auto Sales, LLC.

On January 6, 2018, Cochran filed for chapter 13 relief. On March 9, 2018, ACCU filed the instant Complaint for nondischargeability of the debt owed to ACCU by Cochran. On November 9, 2018, the chapter 13 case was converted to a chapter 7 case. The trial of this matter was held on August 12, 2019. At the close of trial, the Court awarded ACCU and Cochran a

judgment against Chatman, and rendered the debt owed to ACCU nondischargeable in any future bankruptcy case that may be filed by Chatman. (Docs. 76, 80). Having considered the evidence and arguments presented in regard to the fraud allegations against Cochran, the Court hereby finds that the debt owed to Azalea City Credit Union SHALL BE DISCHARGEABLE in Mark Cochran's current bankruptcy case.

## CONCLUSIONS OF LAW

Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt for money, property, services, or an extension, renewal, or refinancing of credit will not be discharged to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C § 523(a)(2)(A).

In order for a particular debt to be excepted from discharge, a plaintiff must prove by a preponderance of the evidence that the defendant's conduct fits within the exception to discharge. *See Grogan v. Garner,* 498 U.S. 279, 291 (1991). Exceptions to discharge must be strictly construed in order to give effect to the "fresh start" policy of the Bankruptcy Code. *In re Meyer,* 296 B.R. 849, 857 (N.D. Ala. Feb. 25, 2003)(*citing Hope v. Walker,* 48 F3d 1161 (11th Cir. 1995); *Equitable Bank v. Miller,* 39 F.3d 301, 304 (11th Cir. 1994)); *see also In re Wood,* 245 Fed. Appx. 916 (Aug. 21, 2007).

### Counts One and Five: § 523(a)(2)(A) Fraud

Some courts have found that the three types of fraud listed in Section 523(a)(2) are inextricably intertwined, such that it is nearly impossible to conceive of a set of circumstances that would constitute actual fraud, but which would not also constitute false pretenses or false representation, making the analysis of fraud one that overlaps with each of the three types listed. *In re Gilmore,* 221 B.R. 864, 872 (N.D. Ala. June 17, 1998). Thus, a finding of actual fraud

would necessitate and subsume a finding of false pretenses and false representations. Other courts have applied the three types of fraud separately because Section 523(a)(2)(A) is written in the disjunctive. *See Matter of Johnson,* 2017 WL 1839159, at *8 (Bankr. N.D. Ala. May 5, 2017)(*citing In re Zeller,* 242 B.R. 84, 87 (Bankr. S.D. Fla. 1999). This Court agrees with the learned Judge Cohen in *Gilmore*, that despite the statute being written in the disjunctive, the analysis of each type of fraud does indeed overlap.

### False Pretenses

"False pretenses are implied, and includes any intentional fraud or deceit practiced by whatever method in whatever manner." *Matter of Johnson*, 2017 WL 1839159, at *8 (Bankr. N.D. Ala. May 5, 2017). "False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol or token calculated and intended to deceive." *Id.* "It is a series of events, activities or communications which, when considered collectively, create a false sense and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor." *Id.* Silence or concealment as to a material fact can constitute false pretenses." *Id.*

### False Representation or Willful Misrepresentation

A false representation typically requires an express misrepresentation by a debtor to an issuer of credit. *Johnson,* 2017 WL 1839159, at *8. Reckless disregard for the truth can constitute a false representation. *In re Meyer,* 269 B.R. 849 (N.D. Ala. 2003). "The term 'reckless' has been interpreted to be the equivalent of *intentional*." *In re Booth,* 174 B.R. 619, 623 (Dec. 1, 1994)(emphasis in original).

### Actual Fraud

8
Case 18-00069    Doc 182    Filed 08/28/19    Entered 08/28/19 16:42:06    Desc Main
Document    Page 8 of 12

Actual fraud is determined on a case-by-case basis. *In re Meyer,* 296 B.R. 849, 858 (Bankr. N.D. Ala. 2003). The elements to prove actual fraud under § 523(a)(2)(A) are based on the traditional elements of common law fraud. *In re Meyer,* 296 B.R. at 858. "Thus, to prevail under that section, a creditor must prove that

> (1) the debtor made representations;
> (2) at the time, the debtor knew the representations were false;
> (3) the debtor made the false representations with the purpose and intention of deceiving the creditor;
> (4) the creditor justifiably relied on such representations; and
> (5) the creditor sustained a loss as a result of the representations.

*Id.* (*citing AT & T Universal Card Servs. Corp. v. Reach,* 225 B.R. 236, 239 (Bankr. N.D. Ala.1997)); *see also Field v. Mans,* 516 U.S. 59, (1995); *Am. Express Travel Related Servs. Co. v. McKinnon,* 192 B.R. 768, 771 (Bankr. N.D. Ala.1996).

Having considered the evidence in relation to the law set out above, the Court finds that ACCU failed to meet its burden of proof on any of the types of fraud under § 523(a)(2)(A). There was no evidence that Cochran engaged in any intentional fraud or deceit sufficient to rise to the level of false pretenses. Likewise, no evidence was presented that Cochran made representations which he either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentations which would rise to the level of false representations. Lastly, no evidence was presented sufficient to meet any of the badges of fraud establishing that Cochran engaged in actual fraud regarding the loan. Therefore, the Court finds in favor of Cochran and against ACCU on the § 523(a)(2) fraud counts.

Counts Two and Three: § 523(a)(4)
Embezzlement and Breach of Fiduciary Duty

Embezzlement

"Bankruptcy courts define embezzlement as the 'fraudulent appropriation of property of

another by a person to whom such property has been entrusted or to whose hands it has lawfully come.'" *In re Taylor*, 551 B.R. 506, 521 (Bankr. M.D. Ala. 2016)(*citing Matter of Weber,* 892 F.2d 534, 538 (7th Cir.1989) (quoting *Moore v. United States,* 160 U.S. 268, 269(1895)); *see also Belfry v. Cardozo (In re Belfry),* 862 F.2d 661, 662 (8th Cir.1988). To establish embezzlement, a creditor must show that: (1) the creditor entrusted property to the debtor; (2) the debtor appropriated the property for a use other than that for which it was entrusted; and (3) the circumstances indicate fraud." *Matter of Chaney*, 596 B.R. 385, 405 (Bankr. N.D. Ala. 2018). "Debts which arise from simple conversion are not excepted from discharge." *In re Taylor*, at 521. Instead, "the creditor must show that the misappropriation was done with fraudulent intent." *Ibid.* "Fraudulent intent may be inferred from surrounding circumstances and the conduct of the accused." *Ibid.*

The evidence presented was insufficient to establish that Cochran appropriated the property for a use other than that for which it was entrusted with the circumstances of the transaction indicate fraud by Cochran. Therefore, the Court finds in favor of Cochran and against ACCU regarding the embezzlement allegations.

Breach of Fiduciary Duty

"To establish fraud while acting in a fiduciary capacity, one must show (1) that the debt results from a fiduciary's defalcation under an express or technical trust; (2) that the debtor acted in a fiduciary capacity with respect to the trust; and (3) that the transaction in question is a defalcation [or fraud] within the meaning of bankruptcy law." *In re Migell*, 2018 WL 1174890, at *5 (Bankr. M.D. Fla. Mar. 2, 2018) (citations omitted). "The meaning of "fiduciary capacity" in § 523(a)(4) is a question of federal law." *In re Arthur*, 589 B.R. 761, 765 (Bankr. S.D. Fla. 2018) (*citing In re Talmo*, 175 B.R. 775 (Bankr. S.D. Fla. 1994)).

The term "fiduciary" as used in § 523(a)(4) does not encompass the traditional application of fiduciary—"a relationship involving confidence, trust, and good faith." *In re Kanewske*, 2017 WL 4381282, at *7 (Bankr. M.D. Fla. Sept. 29, 2017); *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir. 1993). "Rather, 'fiduciary' under § 523(a)(4) is narrowly construed and requires the existence of an express or technical trust. An express or technical trust exists when there is: (1) a segregated trust res; (2) an identifiable beneficiary; and (3) affirmative trust duties established by contract or by statute." *In re Kanewske*, 2017 WL 4381282, at *7. Further, the "trust relationship [shall] have existed prior to the act which created the debt in order to fall within the fiduciary capacity exception." *In re Fernandez-Rocha,* 451 F.3d 813, 816 (11th Cir. 2006).

Here, no evidence was presented that an express or technical trust existed prior to the transaction or that Cochran was a fiduciary under the circumstances of the transaction. Therefore, the Court finds in favor of the Debtor on Counts Two and Three.

<u>Count Four: Unjust Enrichment</u>

To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation. *Portofino Seaport Village, LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008); *see also American Family Care, Inc. v. Fox*, 642 So. 2d 486, 488 (Ala. Civ. App. 1994).

No evidence was presented sufficient to rise to the level of unjust enrichment by Cochran. Therefore, the Court finds in favor of Cochran on Count Four as well.

<u>CONCLUSION</u>

"Exceptions to discharge are construed strictly against the complaining party and

11
Case 18-00069    Doc 182    Filed 08/28/19    Entered 08/28/19 16:42:06    Desc Main
Document      Page 11 of 12

liberally in favor of the debtor in order to effectuate the fresh start policy that is the primary purpose of the Bankruptcy Code." *Rutland v. Petersen (In re Petersen),* 323 B.R. 512, 516 (Bankr. N.D. Fla. 2005). Construing the evidence liberally in favor of the Debtor, the Court finds that the debt owed to Azalea City Credit Union by Debtor Mark Cochran is DISCHARGEABLE.

All matters having been adjudicated herein, the Clerk is DIRECTED to dismiss this Adversary Proceeding with prejudice as soon as practicable.

Dated: August 28, 2019

_____
JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE